WO

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>　　　　　Plaintiff,<br><br>v.<br><br>Nicole Shermaine Martinez,<br><br>　　　　　Defendant. | CR  23-00081-TUC-CKJ (MAA)<br><br>**REPORT AND RECOMMENDATION** |

This action was referred to Magistrate Judge Michael Ambri for pretrial matters. On March 7, 2023, Defendant filed a Motion to Suppress Evidence. Doc. 32. The Government filed a Response. Doc. 37. Defendant did not file a Reply. An evidentiary hearing was held on May 10, 2023. Doc. 44. Defendant was present and represented by counsel. United States Border Patrol Agents ("BPAs") Bradford Sallee and Ryan Olivas testified for the Government. Defendant did not call witnesses. Government's Exhibits 1-7 and 9-11 were admitted into evidence by stipulation of the parties. Defendant objected to part of Government's Exhibit 8. The parties stipulated to admission of a redacted Exhibit 8 and the redacted exhibit was admitted into evidence. Defendant did not offer exhibits.

Defendant is charged in a two-count indictment with conspiracy to transport illegal aliens for profit and transportation of illegal aliens for profit. Doc. 9 (redacted). The Motion to Suppress (Doc. 32) argues BPA Sallee stopped Defendant's vehicle without reasonable suspicion in violation of the Fourth Amendment. Defendant seeks exclusion of all evidence resulting from the stop. The Government argues reasonable suspicion existed.

Having considered the briefing, testimony, exhibits admitted into evidence, and arguments, the Magistrate Judge recommends that the motion be denied. The Court finds, based on the totality of circumstances, that reasonable suspicion existed for the stop.

**Circumstances Of The Stop.**

The stop occurred on Federal Route 1 ("FR-1") in southwestern Arizona. FR-1 is a two-lane paved road on the Tohono O'odham Nation ("TON"). Hearing Transcript ("HT") at 24:4-5, 35:13-23, 63:8-9; Exhibit 11. FR-1 runs approximately 30 miles southward beginning at State Route 86 ("SR-86") through the TON communities of Gu Vo, Pia Oik and Menagers Dam. HT 23:16-23; 32:18 to 33:5. Gu Vo is the northernmost of the three communities on FR-1, nearest SR-86 at approximately milepost 20. *Id.* Pia Oik is the next community heading south on FR-1, at approximately milepost 11. *Id.* Menagers Dam is the southernmost community on FR-1, approximately a half-mile or so north of the United States-Mexico border. *Id.* FR-1 dead-ends at Menagers Dam. Exhibit 1 at p. 2.

At the time of the stop, BPA Sallee had been a Border Patrol agent working out of the Border Patrol's Ajo Station in southwestern Arizona for approximately 17 years. HT 21:13-20. He had worked the FR-1 corridor on and off for approximately 13 years. HT 22:21 to 23:1. For the four years preceding this stop, he worked almost exclusively in the

- 2 -

FR-1 corridor.  *Id*.  BPA Sallee testified that, due to his training and years working the FR-1 corridor, he was familiar with the area's communities, many or most of the locally owned vehicles, and drug and human smuggling in the area.  HT 22:3-20, 24:4 to 27:6, 36:9-24.

BPA Sallee describes the FR-1 corridor as remote, with small rural populations and little local vehicular traffic.  Exhibit 1 at p. 2; HT 64:8-12.  Gu Vo, Pia Oik and Menagers Dam are the only communities on FR-1.  HT 23:22-25.  Aerial images show sparsely developed areas surrounded by expanses of wilderness.  Exhibits 3-10.  According to BPA Sallee, Menagers Dam is the most populous of the three communities with, as a very rough estimate, perhaps 300 people.  HT 26:5-7; 49:17 to 50:7.  According to BPA Sallee, the only edifices in Menagers Dam are residential with the exception of a recreation center for TON members.  HT 26:12-22, 66:18-20, 67:22 to 68:5.  Aerial images show a small residential community.  Exhibits 6 and 7; HT 31:16 to 32:13.  There are no commercial buildings, no public facilities, no apartment complexes, no housing developments, no tourist destinations, no convenience stores, no gas stations and no restaurants in the area. HT 26:12-22, 32:1-13, 67:22 to 68:5.  FR-1 is the only paved road in the corridor; all other roads are residential dirt roads.  HT 31:2-8.  According to BPA Sallee, people are required to obtain permission from TON to be in the FR-1 corridor, except for TON members and their guests, and signs are posted to that effect.  HT 24:6-12, 65:3-11.  However, no physical barriers prevent access to and within the area.  HT 64:25 to 65:3, 69:3-8.  The FR-1 corridor has no Border Patrol checkpoints.  Exhibit 1 at p. 2.

BPA Sallee describes Menagers Dam as a "high-traffic" area for drug and human smuggling.  HT 24:17-22. BPA Sallee testified that, based on his 17 years with Border

Patrol, drug and human smuggling have occurred there daily. HT 24:23-25. According to BPA Sallee, Menagers Dam has approximately 50-70 buildings, many of which are unoccupied at various times and, when unoccupied, are often used by smugglers as stash houses for drugs and undocumented non-citizens ("UNCs"). HT 25:14 to 26:4; Exhibits 6 and 7. BPA Sallee testified that, over the years, he has personally pulled drugs and UNCs from most of the buildings in Menagers Dam. HT 25:2-6. There are several "loadout" areas along FR-1 in and around Menagers Dam where drugs and UNCs are loaded into vehicles to be brought north on FR-1 and further in the United States. HT 25:7-14. According to BPA Sallee, a large wash at milepost 2 near Menagers Dam is a known loadout area where smugglers pick up UNCs and drugs for transportation north on FR-1. HT 25:7-11. Other such loadout areas exist at various points along FR-1 farther north of Menagers Dam, including at or near mileposts 4, 5 and 7. HT 25:12-14. BPA Sallee testified that smuggling in the area typically involves nonlocal vehicles traveling south on FR-1 toward or to Menagers Dam, making a quick turnaround having picked up drugs or UNCs in a loadout area or stash house, and traveling back out north on FR-1 up to SR-86 and then further into the United States. HT 36:9 to 37:2, 41:22 to 42:2, 67:18-21.

On Sunday, January 15, 2023, BPA Sallee was on duty in his patrol vehicle parked along FR-1 at or near milepost 20 in or near Gu Vo. HT 23:2-10, 36:1-2, 45:16-23. At approximately 5:30 p.m., just before sundown, a silver Chevrolet Equinox traveling south on FR-1 caught his attention. HT 36:1 to 37:5, 52:8-21. He had never seen the vehicle before and did not recognize the vehicle as belonging to an area resident. HT 68:6-9. He ran the license plate and found the vehicle was registered in Eloy, Arizona, approximately

100 miles away in BPA Sallee's estimation. HT 36:4-7, 37:3-5. In BPA Sallee's experience, local vehicles are typically registered in Sells or Ajo, closer populous areas with Sells a TON hub and Ajo providing access to mailboxes. HT 26:23 to 27:6. In BPA Sallee's experience, area residents do not typically have ties to Eloy. HT 56:13-19; Exhibit 1 at p. 2. According to BPA Sallee, Eloy is a trans-shipment center, among others in Arizona, for drug and human smuggling. Exhibit 1 at p. 2; HT 58:16 to 59:12. Also in BPA Sallee's experience, vehicles used in smuggling in the FR-1 corridor have typically been registered to places other than Ajo and Sells, and vehicles registered to Eloy have often been found in smuggling in the area. Exhibit 1 at p. 2; HT 36:12-18, 57:22 to 58:15. Also, the vehicle was registered to a surname that BPA Sallee did not recognize as a surname in the area. HT 36:19-24. BPA Sallee testified that he had become familiar over the years with most of the surnames in the area, and he had never come across a resident or associate of a resident with that surname. HT 36:19-24, 68:10-14. In BPA Sallee's experience, smuggling in the area most often involves nonlocal vehicles guided by smuggling associates to the Menagers Dam area to pick up drugs or UNCs. HT 36:13-18.

At the time BPA Sallee noticed the vehicle at milepost 20, BPA Olivas was on duty in his patrol vehicle farther south on FR-1 at approximately milepost 5, south of Pia Oik and north of Menagers Dam. HT 8:16-19; Exhibit 1 at p. 3. BPA Sallee contacted BPA Olivas and confirmed BPA Olivas's position. HT 9:7-10, 9:23 to 10:6, 39:7-8. BPA Sallee gave BPA Olivas a description of the Equinox and asked BPA Olivas to notify him if the Equinox passed BPA Olivas's position. HT 9:23 to 10:10; Exhibit 1 at p. 3. Approximately 10 to 15 minutes later, BPA Olivas saw the vehicle pass his position near milepost 5 and

- 5 -

continue south on FR-1 toward Menagers Dam, and he informed BPA Sallee of his observation. HT 10:11-17, 12:8-12; Exhibit 1 at p. 3. Having passed BPA Olivas's position, the vehicle was heading toward Menagers Dam. Exhibit 1 at p. 3.

Approximately 15 to 20 minutes later, BPA Olivas was driving south on FR-1 toward Menagers Dam when he again saw the Equinox. HT 12:13-18. This time, the vehicle was heading back north on FR-1. HT 12:17-18. BPA Olivas notified BPA Sallee that the vehicle was heading back north on FR-1. HT 12:19-24. This communication occurred between 6:00 p.m. and 6:10 p.m. Exhibit 1 at p. 3; HT 41:5-7. According to BPA Sallee, the timing and turnaround at or near Menagers Dam, with the evidence of a nonlocal vehicle and nonresident, fit the pattern for smugglers picking up drugs or UNCs in the area. HT 41:21 to 42:2. BPA Sallee then set out to stop the vehicle. HT 41:15-20, 63:2-3.

BPA Sallee stopped the vehicle near milepost 11 on FR-1. Exhibit 1 at p. 3; HT 42:3-7. It is alleged that the driver of the Equinox was Defendant. Exhibit 1 at p. 3. It also is alleged that two UNCs were found on the backseat floor hiding under blankets. *Id.*

An image from BPA Sallee's body camera footage during the stop shows a near-dark sky, the Equinox with its headlights illuminating the road ahead, and no other vehicles on FR-1. Exhibit 11; HT 35:13-23. Only one other vehicle passed the area of the stop and subsequent investigation and arrests. HT 64:8-24, 13:3-5.

**Motion To Suppress.**

In support of the stop, the Government cites BPA Sallee's conclusion that the facts fit the pattern for smuggling in this high-smuggling area, particularly that the vehicle and driver appeared to be nonlocal, followed a notorious smuggling route in a restricted and

- 6 -

rural area at or near sundown, and made a quick turnaround in the location of loadout areas and stash houses near the border and headed back north. Defendant argues the facts amount to a hunch or broad profile casting too broad a net over innocent traffic such as residents, visitors or someone out for a drive. Defendant notes the vehicle was not speeding, weaving or moving in an erratic manner; the vehicle's windows were not unusually dark; the driver was not observed acting nervous; an unusual number of passengers was not observed; the vehicle did not appear heavily laden; and the vehicle was not observed stopping anywhere.

### **Reasonable Suspicion Standard.**

A law enforcement officer may make an investigatory stop consistent with the Fourth Amendment if there is reasonable suspicion to believe that criminal activity may be afoot. *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (citations omitted). Reasonable suspicion exists when specific facts, together with rational inferences drawn from them, warrant a suspicion that the person has committed or is about to commit a crime. *United States v. Cortez*, 449 U.S. 411, 416-19 (1981); *see also United States v. Valdes-Vega*, 738 F.3d 1074, 1078 (9th Cir. 2013) (defining reasonable suspicion as "a particularized and objective basis for suspecting the person stopped of criminal activity") (citation omitted).

Reasonable suspicion is more than a "hunch," but it is a low bar and does not require probable cause. *Arvizu*, 534 U.S. at 274. Reasonable suspicion requires considerably less indication of wrongdoing than that required to satisfy the preponderance of evidence standard. *Id.* (citing *United States v. Sokolow*, 490 U.S. 1, 7 (1989)).

The Court is to consider the totality of the circumstances that confronted the officer at the time of the stop. *Sokolow,* 490 U.S. at 8; *United States v. Berber-Tinoco*, 510 F.3d

1083, 1087 (9th Cir. 2007). The assessment precludes a "divide-and-conquer analysis" because, though each of the suspect's acts may be innocent, when taken together under the circumstances they may warrant further investigation. *Arvizu,* 534 U.S. at 274. "A determination that reasonable suspicion exists ... need not rule out the possibility of innocent conduct." *Valdes-Vega,* 738 F.3d at 1078-79 (quoting *Arvizu,* 534 U.S. at 277).

The facts underlying reasonable suspicion must be measured against an objective reasonableness standard. *Gonzalez-Rivera v. I.N.S.,* 22 F.3d 1441, 1445 (9th Cir. 1994). However, an officer is "entitled to assess the facts in light of his experience in detecting illegal entry and smuggling." *United States v. Brignoni-Ponce,* 422 U.S. 873, 885 (1975). An officer's training and experience may be considered in his or her assessment of the facts so long as inferences drawn are objectively reasonable, and the Court is to give such reasonable inferences "due weight." *Arvizu*, 534 U.S. at 273, 277; *see also Cortez*, 449 U.S. at 418; *United States. v. Montero-Camargo*, 208 F.3d 1122, 1131 (9th Cir. 2000).

For stops by Border Patrol agents, the totality of circumstances may include but are not limited to:  (1) the characteristics of the area where the vehicle is encountered; (2) the vehicle's proximity to the border; (3) usual patterns of traffic and time of day; (3) patterns and information about previous drug or human smuggling in the area; (4) whether certain types of vehicles are frequently used to transport contraband or undocumented people; (5) erratic behavior on the part of the driver or attempts to evade law enforcement; and (6) whether the vehicle is heavily loaded or has an unusual number of passengers. *Brignoni-Ponce*, 422 U.S. at 884-85.  "Not all of these factors must be present or highly probative in every case to justify reasonable suspicion ... [a]nd the facts must be filtered through the

lens of the agents' training and experience." *Valdes-Vega,* 738 F.3d at 1079.

If the stop lacks reasonable suspicion, all evidence seized as a result of the stop must be suppressed as fruit of the poisonous tree. *United States v. Morales*, 252 F.3d 1070, 1073 (9th Cir. 2001).

**Discussion.**

The Court finds reasonable suspicion for the stop. The characteristics of the area, proximity to the border, information about the vehicle, usual pattern of local traffic, time of day, behavior of the vehicle, and history and pattern of smuggling in the area, together with the reasonable inferences of an experienced agent, support BPA Sallee's reasonable suspicion that this vehicle had traveled into the FR-1 corridor, had picked up drugs or UNCs, and was traveling back to Eloy or elsewhere with its illegal cargo.

The FR-1 corridor is a heavy smuggling route, due to its rural nature, proximity to the border, ready availability of stash houses and loadout areas, and lack of Border Patrol checkpoints. It has a history of daily smuggling in which nonlocal vehicles travel south on FR-1 from SR-86 to or near Menagers Dam, pick up drugs or UNCs from loadout areas or stash houses, and travel back out north on FR-1 to SR-86 and beyond. *See Arvizu,* 534 U.S. at 269, 277 (finding it significant that defendant was on route primarily used by ranchers and forest service employees but commonly used by smugglers); *Berber-Tinoco,* 510 F.3d at 1088-89 (relying on agents' inferences from modes and patterns of smuggling). FR-1 dead-ends in Menagers Dam just a half-mile or so from the border. The area has relatively few residents and little traffic. Aside from residences, many of which are often unoccupied and used by smugglers as stash houses, the area has no visitor accommodations

or attractions. There are no businesses. The vehicle was first encountered at the north end of FR-1 near SR-86 driving south toward Menagers Dam at or just before sundown on a Sunday evening. BPA Sallee's records check revealed the vehicle was registered to Eloy, a smuggling trans-shipment center, typical of smuggling in the FR-1 corridor. The vehicle traveled from SR-86, a route from Eloy and other smuggling centers, to or near Menagers Dam into an area where active loadout areas exist within easy walking distance of the border. The vehicle, having traveled to an area where drugs and UNCs are loaded into vehicles, headed back north on FR-1, back toward where it came, within minutes, also characteristic of active smuggling in the area. Given a speed limit of 35 miles per hour between communities (HT 15:21-16:4) and the 15 to 30 minutes between the sighting at milepost 5 heading south and the sighting heading back north – and given that the vehicle had traveled from milepost 20 to milepost 5 in 10 to 15 minutes – it is reasonable to infer that the vehicle would have reached the loadout areas at mileposts 4 and 2, or a stash house in Menagers Dam, and could have taken on drugs or UNCs before heading back north.

The facts in this case are sufficiently particularized to avoid the overbreadth Defendant cites. First, though certain facts, if they exist, may support reasonable suspicion, no facts or combination of facts are necessary in all cases. *Valdes-Vega,* 738 F.3d at 1079. The inquiry is whether the facts that do exist, taken together, add up to reasonable suspicion under all the circumstances. *Id.* "Any number of factors may be taken into account in deciding whether there is a reasonable suspicion." *Brignoni-Ponce,* 422 U.S. at 885. Second, reasonable suspicion does not require ruling out innocent behavior. *Valdes-Vega,* 738 F.3d at 1079 (citing *Arvizu,* 534 U.S. at 277). Last, here, the likelihood of a resident

or visitor or someone out for a drive was reduced (*see Arvizu,* 534 U.S. at 277): BPA Sallee's records check indicated a nonlocal vehicle; the vehicle had set out in a remote area on tribal land at sundown when any sights would be obscured by darkness; the small community where the vehicle traveled had no non-residential destinations, attractions or accommodations for visitors; after 17 years working in the area, BPA Sallee was familiar with the local vehicles and this vehicle was not one he had normally observed in the area; signs notified would-be adventurers that the area was restricted; the vehicle traveled within almost a stone's throw of the border, where known stash houses and loadout areas exist; the vehicle spent just minutes there before backtracking north, back toward SR-86 and access to points beyond, including Eloy where the vehicle was registered 100 miles away; and the vehicle had progressed miles back north to Pia Oik before being stopped. The facts relating to this vehicle and its behavior, viewed in the context of the FR-1 corridor and active smuggling in the area and BPA Sallee's experience, reasonably indicated smuggling sufficient to stop the vehicle to investigate whether the activity was innocent.

The Court finds, based on the totality of circumstances, that reasonable suspicion existed for this stop. The Court further finds the agents' testimony and BPA Sallee's report (Exhibit 1) to be credible based on content and demeanor. Any differences or omissions between or among the agents' recollections at the hearing and the report are minor and do not affect the finding of reasonable suspicion.

**Recommendation.**

Based on the foregoing, the Magistrate Judge recommends that the District Court, after its independent review, deny the Motion to Suppress Evidence (Doc. 32).

The parties may file and serve written objections within 14 days of this Report and Recommendation. If objections are not timely filed, the party's right to *de novo* review may be waived.

Dated this 3rd day of July, 2023.

Honorable Michael A. Ambri
United States Magistrate Judge